**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

PAUL E. WALLACE,

       Plaintiff,

vs.                                 CIVIL NO.: 04-CV-71697-DT
                                     HON. ROBERT H. CLELAND

COMMISSIONER OF SOCIAL
SECURITY

       Defendant.
_____/

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

       This matter is before the court on the parties' cross motions for summary judgment. The case was referred to United States Magistrate Judge Steven D. Pepe pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. The magistrate judge issued his report on March 31, 2005 recommending that this court deny defendant's motion for summary judgment, grant plaintiff's motion for summary judgment in part and remand the case to the Administrative Law Judge for further proceedings. No objections have been filed pursuant to 28 U.S.C. §636(b)(1)(C); thus further appeal rights are waived.[1]

       Having reviewed the file and the report, the court determines that the findings and conclusions of the magistrate judge are correct and **ADOPTS** the same for purposes of this order.

_____

[1] The failure to object to the magistrate judge's report releases the court from its duty to independently review the motion. See _Thomas v. Arn_, 474 U.S. 140,149 (1985).

## ORDER

IT IS ORDERED that, for the reasons set forth in the Magistrate Judge's Report and Recommendation, the defendant's motion for summary judgment is **DENIED**, plaintiff's motion for summary judgment is **GRANTED IN PART** and this matter is **REMANDED** for further proceedings.

IT IS SO ORDERED.


 s/Robert H. Cleland_____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  April 28, 2005


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 28, 2005, by electronic and/or ordinary mail.


 s/Lisa G. Teets_____
Case Manager and Deputy Clerk
(313) 234-5522

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL E. WALLACE,

          Plaintiff,                       Case No. 04-71697

vs.                                 HONORABLE ROBERT H. CLELAND
                                     HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

          Defendant.
_____/

REPORT AND RECOMMENDATION

I.    BACKGROUND

Paul Wallace brought this action under 42 U.S.C. § 405(g) to challenge a final

decision of Commissioner denying his application for Disability Insurance Benefits under

Title II of the Social Security Act.  Both parties have filed motions for summary judgment

which have been referred for report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B).  For the reasons that follow, it is recommended Defendant's Motion for

Summary Judgment be DENIED  and that Plaintiff's Motion for Summary Judgment be

GRANTED IN PART and this case remanded for further administrative proceedings consistent

with this Report and Recommendation.

    1.    Procedural History

Plaintiff applied for benefits on June 20, 1998, alleging a disability onset date of

March 10, 1998 (R. 56).  His claim was denied initially on October 21, 1998 (R. 38-42) and

upon reconsideration on October 11, 1999 (R. 48-49).

On September 25, 2000, Plaintiff was represented by an attorney at a hearing held before Administrative Law Judge ("ALJ") William Musseman (R. 383-406). In a decision issued November 21, 2000, the ALJ found that Plaintiff could perform the full range of light work and was not disabled (R. 288-297).

The Plaintiff filed a request for review with the Appeals Council. On April 24, 2002, the Appeals Council found that the Vocational Expert ("VE") had not been subject to cross examination by the Plaintiff and remanded the case ordering the ALJ to address the evidence which was submitted with the request for review and, if warranted, obtain evidence from a VE, including posing a hypothetical question (R.337-338). A second hearing was held before ALJ Musseman on October 2, 2002 (R. 407-419). Plaintiff did not testify and was represented by counsel. Pauline McEachin testified as a VE (R. 410-418). In a decision issued March 24, 2003, ALJ Musseman found that Plaintiff was not disabled because he could perform the full range of light work (R. 14-24). The Appeals Council denied review on March 12, 2004 (R. 6-9 ).

    2.   <u>Background Facts</u>

Plaintiff was born on April 25, 1948, and was fifty-four years old on the date of the ALJ's second hearing (R. 56). He completed 12th grade but did not graduate high school (R. 387). Plaintiff's last day of insured status was June 30, 1998 (R. 60).

    *a.*    *Plaintiff's Hearing Testimony: September 25, 2000*

Plaintiff worked for the Village of Roscommon as a carpenter from 1978 until 1991

(R. 387-388). His duties included constructing and maintaining water and sewer systems, repairing highways, and fixing buildings and equipment. The job involved heavy lifting, up to 300 pounds, climbing ladders, crawling, stooping, bending, and frequent use of a jackhammer (R. 388). In 1981, he injured his lower back while operating a jackhammer (R. 389). He eased back on his work after the injury, but eventually went back to his full duties in construction. As time passed, his back pain worsened and he could no longer perform his job.

In 1991, Plaintiff was treating with Dr. Thiel, who told him that back surgery was not an option unless he "blew out" a herniated disc (R. 390). By the time he finished working for the Village of Roscommon, he could not work a normal 40 hour work week due to pain ( R. 390-391). He began self-employment, where he could set his own hours and schedule, in 1998 (R. 391).

Since 1981, Plaintiff's degenerative disc disease and pain has progressively worsened (R. 391-392). He experiences sharp pain in his back, shoulders, and knees every day ( R. 392). He rated his morning pain at six or seven on a scale of one to ten. He is unable to sleep through the night due to pain (R. 392-393). In order to compensate for his lack of sleep, he naps and rests a lot throughout the day and lies down (R. 393-394).

Plaintiff has had problems with his knees since 1984, when he had his first of three arthroscopic surgeries (R. 394-395). While the surgeries were successful, he experiences grinding in his knees when he walks and his knees give out on him a few times a week. He has been advised by Dr. Keeler, whom he sees two or three times a year, to put off another

3

knee surgery as long as possible.  Dr. Keeler also recommended stretching therapy for Plaintiff's back (R. 395, 402).

Plaintiff has experienced leg pain ever since he hurt his back in 1981 (R. 396).  He has had pain and limitations in his shoulders since the early 80s, for which he was given injections by Dr. Thiel for pain (R.  397).  As time went on, the pain increased and in the late 80s his shoulders started snapping and popping.  It is very painful for him to raise his arms above his shoulders and when he raises his arms his hands go numb.  He had surgery in July of 1998 on his right shoulder for impingement syndrome (R. 398).

Plaintiff has been receiving treatment for depression from Dr. Keener since September of 1999 (R. 399).  He takes Elavil for depression, which makes it hard for him to concentrate (R. 399-400).  His pain medication, Motrin 800 and Darvocet 100, do not relieve his pain but make it more tolerable.  He is able to sit for 15 to 30 minutes before he needs to move, can stand for 15 minutes, and can walk a block or two (R. 400).  He is able to do some laundry, load the dishwasher, and do some light household cleaning (R. 401).  He drives every other day (R. 404).  Plaintiff would like to be able to work, but feels that he will not be able to work five days a week, eight hours a day (R. 403).

The VE Judith Fendora did not testify at this hearing.

>            b.       *Vocational Expert Testimony: October 2, 2002*

On September 10, 2002, VE Pauline McEachin provided the ALJ with a written vocational analysis based on the vocational evidence in the file (R. 411).  Consistent with the ALJ's practice, the VE did not review any medical evidence from Plaintiff's file.  She

classified Plaintiff's past work both as a maintenance manager and as a self-employed carpenter as semi-skilled and heavy (R. 411-412) consistent with her Vocational Analysis in Exhibit 14E (R. 345). After the ALJ stated that he was not going to pose any hypothetical questions, he asserted that Plaintiff's counsel misrepresented the prior record to the Appeals Council as having no VE evidence on the exertional and skill level of Plaintiff's prior work which was in VE Fendora's written analysis Exhibit 9E (R. 102). This was identical to VE McEachin's analysis (R. 412). The ALJ stated that if Plaintiff's counsel wanted to cross examine the VE, "This is your opportunity." (R. 413). ALJ Musseman said he would analyze Plaintiff's other appeals Council evidence in his decision. He noted the relevant disability period was March through June 1998. He suggested he could make a "grid" determination without hypothetical questions to the VE (R. 414). He also seemed confused when he indicated that "grid" determinations are made at Step 4 of the Commissioner's sequential evaluation instead of Step 5 which is where the "grid" becomes relevant.

Plaintiff's attorney, apparently somewhat perplexed, asked the VE if there were any jobs in the national economy that Plaintiff could perform if, from March 10 of 1998 through June 30 of 1998, he: had constant knee pain and could stand no longer than 15 minutes, had constant shoulder pain, had constant back pain requiring him to take Darvocet Codeine which makes him sleepy, and was unable to have prolonged sleep at night and required naps throughout the day (R. 415-416). The VE testified that she could not answer that question (R. 416). Plaintiff's attorney then asked the VE to consider if Plaintiff could stand no longer than 15 minutes and could walk no more than 100 feet. The VE testified that she still could

5

not answer that question.  ALJ Musseman then directed Plaintiff's attorney that the VE only

reviewed Plaintiff's vocational past and would not be evaluating pain or drowsiness (R. 417).

The ALJ then helped Plaintiff's attorney to ask the VE if there would be employment if

Plaintiff could sit one half hour, stand one half hour, and walk one half hour in an 8 hour

work day (R. 417-418).  The VE testified that, with those limitations of only two hours

capacity to work, there would be no employment available to Plaintiff (R. 418).

The ALJ stated that he also saw no relevance in taking further testimony from

Plaintiff (R. 413).  He also stated that:

> You have submitted additional documents that are in the record as Exhibit . . .
> 16F, which is the doctor's medical assessment of ability to do work-related
> activities which I have to deal with as far as what my Decision is, as well as
> his deposition which is Exhibit 17F, which I have to deal with, as well as in
> Exhibit 13-B which is your letter memo to the Appeals Council and its
> attachment.

(R. 414).

### c.   *Medical Evidence*

#### *(1) Evidence Before the ALJ at the Hearing September 26, 2000*

On July 29, 1981, Plaintiff was seen by John Thiel, D.O., an orthopedic surgeon for

an injury sustained at work (R. 245).  X-rays revealed a slight loss of the normal thoracle

lumbar curvature in the lateral roentgenographic projection, but there was no evidence of

gross disc space narrowing or other osseous pathology.  Dr. Thiel diagnosed lumbosacral

syndrome with a lumbosacral strain.  Plaintiff also showed signs of mid-dorsal

musculoskeletal strain.  He was advised to continue work with a restriction of lifting no more

than 15 pounds.

On November 16, 1981, Plaintiff was examined by neurosurgeon J. Eric Zimmerman, M.D., at the request of Dr. Thiel (R. 105). Dr. Zimmerman noted that x-rays and a myelogram by Dr. Thiel were unremarkable. No abnormalities were found on neurologic exam. An EMG of the right lower extremity was ordered to look for evidence of root compression. Dr. Zimmerman found that Plaintiff had more symptoms in his right leg but had no clinical findings compatible with a root compression. On November 23, 1981, Dr. Zimmerman reported that Plaintiff's EMG of the right lower extremity and common peroneal nerve conduction on the right was completely normal (R. 104). The doctor found that Plaintiff did not have a root injury but had a chronic myofascial strain. It was recommended that Plaintiff stay off of heavy physical work until the spring and then do a trial return to work. If he could not perform his normal work by the spring, it was recommended he switch to light work. By June 16, 1982, Dr. Thiel opined that he had little to offer Plaintiff and prescribed him Naprosyn (R. 239).

On October 31, 1986, Dr. Thiel saw Plaintiff for left knee pain (R. 231). X-rays showed no bony pathology. McMurray's test was positive with clicking along the medial joint line and atrophy was noted in the left quadricep. Dr. Thiel diagnosed a torn medial meniscus with a possible synovial plica of the left knee. Surgery was performed on December 1, 1986, and revealed a partially torn anterior cruciate ligament in the left knee and acute and chronic synovitis of the left knee (R. 228).

Plaintiff treated with chiropractor Michael Richie from September of 1983 through 1997 (R. 142-158). An x-ray from October 19, 1990, ordered by the chiropractor, showed

minimal degenerative osteoarthritic changes and periarticular calcification, suggestive of some degree of mild chronic inflammation (R. 158). In a summary sent to State Farm Insurance on October 2, 1991, the chiropractor stated that Plaintiff was much improved and was seeing him only periodically for maintenance (R. 157).

On October 26, 1990, Plaintiff saw Dr. Thiel for right shoulder pain (R. 225). Plaintiff was unable to adduct greater than 85 to 90 percent, his internal rotation was as markedly limited as his external rotation, and he experienced numbness in his hands. Dr. Thiel opined that Plaintiff may have had thoracic outlet syndrome or a cervical problem, but felt that that was unlikely because his reflexes and sensation were grossly normal. X-rays revealed narrowing of the humeral head acromion articulation. Plaintiff was diagnosed with right shoulder impingement syndrome. An arthrogram ruled out a rotator cuff tear (R. 224). Plaintiff was prescribed physical therapy and Ansaid.

On January 25, 1991, Plaintiff received a Depo Medrol injection in his left shoulder (R. 222). On February 8, 1991, he showed tremendous improvement from the injection (R. 221). Dr. Thiel found that he could return to normal daily activities with no restrictions.

Plaintiff was examined by Wallace Ross, D.C., on August 18, 1992, at the request of a workers' compensation insurance company (R. 106-114). Plaintiff denied taking any medication and listed Dr. Thiel and Dr. Richie as his treating physicians (R. 107). He was diagnosed with lumbar scoliosis, convexity on the right, decreased L5 disc spacing, and osteoarthritic changes at L1-L2 (R. 112). He was found to be not disabled and able to work without restrictions. Continued chiropractic care was found to be unreasonable.

8

On August 25, 1992, Plaintiff was examined by Harvey Andre, M.D., an orthopedic surgeon, also at the request of the insurance company (R.116-122).  Plaintiff told Dr. Andre that he originally strained his back in 1970 and that the incident in 1981 had aggravated his condition (R. 117).  After he was injured in 1981, he was off work for about 6 months, and then returned to his same job for another 10 years.  X-rays showed some degeneration of all of the lumbar discs, most notably the lumbosacral discs (R. 121).  While Plaintiff complained of pain, on clinical examination he checked out very well (R. 122).  Dr. Andre found that Plaintiff was not a good candidate for heavy manual labor and should lift no more than 50 to 75 pounds close to the body and no more than 20 pounds away from the body.  The doctor noted that no treatment would restore his discs and typically symptoms increased with age.

Plaintiff saw Jacob Zyirbulis, M.D.,  a psychiatrist and neurologist, at the request of the insurance company on January 19, 1993 (R. 123-129).  He complained of pain in his mid and lower back, right hip and thigh, right shoulder, and left knee, and indicated nothing would be clearly defined as a psychiatric complaint (R. 125).  He reported no sense of depression, sleep impairment, concentration impairment, or appetite impairment.  He was working odd jobs painting and doing carpentry (R. 127).  For leisure he went camping, hunting, and fishing, but reported that his activities were somewhat restricted.  Dr. Zyirbulis diagnosed him with possible pathological changes in his lumbosacral area and enduring chronic pain (R. 128).

On January 30, 1993, Plaintiff was examined by Steven Newman, M.D., a neurologist and psychiatrist (R. 130-134).  During the exam, Plaintiff complained of numbness, tingling,

9

and aching which radiated into his arms from his shoulder girdles through his palms (R. 131).

Range of motion of his shoulder girdles was restricted and there was a palpable and audible

click over his AC joints bilaterally (R. 131). Knee flexion was slightly limited and Plaintiff

complained of his knees giving out periodically. Plaintiff had difficulty doing one-handed

and two-handed tasks (R. 132). X-rays showed cervical spine limitations of hyperflexion

greater than hyperextension. Narrowing of the AC joints bilaterally was revealed and the

lumbar spine demonstrated a mid-lumbar dextro-convexity scoliosis with the anterior

eburnation of the lower lumbar vertebrae (R. 132-133). Facet sclerosis was present at L5-S1

and spina biffida occulta at S1 was noted with narrowing at the posterior aspect of the

lumbosacral joint (R. 133). His knees showed narrowing at the patellofemoral spaces in the

upper portion of the knees. Dr. Newman diagnosed him with: degenerative disc disease at

the lumbosacral joint, suggested roentgenographically, with right greater than left sciatic

radicular components historically; traumatic fibromyalgia of the dorsolumbar spine

musculature in a structurally weak back; osteoarthritis of the knees, left greater than right,

with residual capsulitis and tendinitis; traumatic capsulitis and tendinitis with early arthritic

changes and narrowing at the AC joints of the shoulder girdles bilaterally; and bilateral

clinical thoracic outlet symptomatology of the upper extremities. Based on the extensive

diagnosis and the high morbidity risks, the doctor restricted Plaintiff in reaching, stretching,

pushing, pulling, overhead activities, prolonged sitting or standing, lifting, bending, stooping,

turning, twisting, kneeling, stooping, squatting, and weight bearing activities (R. 134).

Plaintiff returned to Dr. Andre on February 1, 1993 (R. 136-141). Upon physical

exam, range of motion was limited in flexion (R. 139-140).  Supine straight leg raising was

positive at 60 degrees bilaterally and additional dorsiflexion of the foot produced increased

tightness (R. 140).  Dr. Andre diagnosed Plaintiff with degeneration of all the lumbar

intervertebral disc, most marked at the lumbosacral level, and possible disc ruptures at L3-L4

and L4-L5 (R. 140).  Dr. Andre concluded that Plaintiff could return to a sedentary job where

he avoided repetitive twisting and bending and could sit, stand ,or walk as comfort dictated,

limited to working with objects directly in front of him not exceeding 10 pounds (R. 141).


        Plaintiff saw Dr. Thiel on November 12, 1993, for evaluation of his knees (R. 220).

On examination he had no joint effusion, good quads and hamstrings, no maltracking of the

patella, and significant patellofemoral crepitance.  X-rays revealed grade I osteoarthritic

changes in the medial compartments of the knees.  Dr. Thiel diagnosed him with

chondromalacia of the patellofemoral joints, possibly grade I-II.  He was prescribed Relafen

and Maalos.  On December 3, 1993, Dr. Thiel noted that Plaintiff was much improved with

the use of Relafen and had much less pain (R. 219).  On January 7, 1994, he noted that

Plaintiff had very little improvement with the Relafen and continued to have pain and

discomfort.

        On February 16, 1994, Plaintiff underwent arthroscopic surgery on his left knee (R.

217-219).  He was diagnosed with grade II chondromalacia of the Patellofemoral joint with

chronic synovitis.  Plaintiff saw Dr. Thiel on March 3, 1994, and reported that his knee was

doing "great" (R. 215).  On April 6, 1994, Dr. Thiel performed arthroscopic surgery on

11

Plaintiff's right knee (R. 213-214). Plaintiff was diagnosed with grade II chondromalacia, and mild peripheral synovitis in the joint.

From 1997 to 1998, Plaintiff treated regularly with David Migdar, D.C., a chiropractor (R. 162-193).

On April 28, 1998, Dr. Thiel saw Plaintiff for pain in his elbow (R. 209). Dr. Thiel reported that "Paul looks great." Upon physical exam, he had positive middle finger test, pain with resisted extension of the right wrist, pain at the lateral epicondyle, and he lacked 5 to 10 degrees of extension in his elbow. Dr. Thiel diagnosed him with lateral epicondylitis in his right elbow. On May 22, 1998, Plaintiff received an injection of Depo Medol in his elbow (R. 207). June 3, 1998, X-rays of his shoulders showed some mild changes of degenerative arthritis in the AC joints and a spur at the anterior portion of the acromion process. Dr. Thiel referred Plaintiff to Dr. Habryl for evaluation for shoulder surgery. On June 8, 1998, Plaintiff saw a doctor who found he had impingement subacromially in his right shoulder, and possible thoracic outlet syndrom (R. 205).

Plaintiff saw Dr. Habryl, an orthopedic surgeon, on June 15, 1998 (R. 197). X-rays of his right shoulder showed changes with some calcific tendinitis and sclerosis in the subacromial space. The doctor advised Plaintiff that doing overhead work was not consistent with care for his shoulders. An MRI showed a significant subacromial fluid collection consistent with a bursitis. On July 31, 1998, a tear of the glenoid labrum and impingement syndrome were discovered during right shoulder Arthroscopic surgery.

On October 12, 1998, Plaintiff was examined by Steven Wilson, M.D., at the request

12

of the Michigan Disability Determination Service (R. 249-252).  Plaintiff reported back pain since 1981, knee pain since 1985, and shoulder pain since the early 1980's (R. 249).  He rated his pain at a 6 on a scale of 1 to 10 and standing, walking, bending, or sitting for long periods exacerbated the pain.  He was dependent on others for shopping and required help with laundry, bathing, and homemaking, but was able to drive short distances and get around his home and community on his own (R. 250).  Upon examination, pin prick test was negative bilaterally, slump test was negative, and no spasms were noted (R. 251).  Plaintiff had no tenderness in the Lumbosacral area but SI joint tenderness bilaterally with compression.  Crepitus was noted in both knees with no effusion.  Lumbar range of motion studies were abnormal as were range of motion studies for his shoulder, elbow, knee, and ankle (R. 253-254).  Dr. Wilson diagnosed Plaintiff with bilateral SI joint dysfunction, history of osteoarthritis, right shoulder repair of glenoid labrum with impingement syndrome, bilateral shoulder pain, and levoscoliosis of the thoracic spine.

A Psychiatric Review Technique form of March 31, 1998, reported that there was insufficient medical evidence to come to a conclusion (R. 264).  A Physical Residual Functional Capacity assessment of October 4, 1999, found Plaintiff could: occasionally lift 50 pounds; frequently lift 25 pounds; and sit, stand and/or walk 6 hours in an 8 hour workday (R. 257).  He could never climb a ladder, rope, or scaffold, and occasionally climb stairs, balance, stoop, kneel, crouch or crawl (R. 258).  He had limited reaching ability (R. 259).

On May 3, 2000, Plaintiff saw George Kieler, M.D. (R. 273).  Plaintiff had just returned from Florida and complained of pain in his right shoulder, right elbow, knees, and

13

back.  Upon physical exam, he had crepitation and restriction of abduction of both arms with

snapping of the right shoulder.  The elbows showed bilateral tenderness and he was unable to

extend to 180 degrees.  There was crepitation and swelling with effusion over both knees.

Dr. Kieler recommended Plaintiff should not do work that required stooping, standing,

bending, lifting over his head, or constant flexion or extension of his elbows.  He was

prescribed Darvocet and Elavil, given some Arthrotec, and was told to continue on Tylenol.

Dr. Kieler completed a Medical Assessment of Ability to do Work-Related Activities

Form on May 15, 2000 (R. 275-278).  Dr. Kieler found that, since March 10, 1998, Plaintiff:

could not stand or walk during a work day and could sit for one half hour; could occasionally

lift or carry five pounds; could occasionally perform simple grasping; could not push, pull, or

use arm or leg or foot controls; and could not twist, bend, reach above shoulder level, squat,

kneel, climb ladders, crouch, crawl, or stoop.  The doctor noted that there was no indication

that Plaintiff could ever be completely rehabilitated so that he could return to full-time

employment (R. 278).

*(2)      Evidence Before the ALJ at the Hearing on October 22, 2002*

On September 26, 2002, Dr. Kieler was deposed.  He testified that he has first seen

Plaintiff in June of 1988 and had seen him as recently as 2002, and that he was Plaintiff's

primary care physician during that time (R. 362-262).  In 1994, he referred Plaintiff to Dr.

Thiel for treatment of his knee condition, and Dr. Thiel performed knee surgeries (R. 363-

364).  He also referred Plaintiff for shoulder surgery and for treatment of his back condition

(R. 364-365).  Some time before March 10, 1998, he referred Plaintiff for a myelogram with

14

the diagnosis of herniated disc at L3, L4 and L5.  Dr. Kieler testified that Plaintiff had a herniated disc, impingement of his shoulders, and degenerative disc disease of his knees before March 10, 1998 (R. 365).  He last saw Plaintiff on May 28, 2002, for back pain, knee pain, and shoulder pain (R. 366).  He testified that the limitations noted in his May 15, 2000, report (referenced earlier) had been in place since before March 10, 1998, based on his treatment of Plaintiff and his review of the records (R. 366-367).

He further testified that if the Plaintiff walked, he should be supported by a grocery cart or something similar (R. 367).  He reiterated the half-hour limitation of standing, sitting, or walking, as well as the 5 pound lifting restriction, and stated that all of these restrictions were in place on or before June 30, 1998 (R. 367-368).  He attributed these restrictions to Plaintiff's degenerative arthritis and loss of cartilage, and noted that Plaintiff had median nerve damage that restricted his ability to use his hands (R. 368-370).  He concluded that Plaintiff could not work full-time with his restrictions and would not have been able to do so as of June 30, 1998 (R. 370-371).

II.    ANALYSIS

1.    Standard of Review

Congress limited the scope of federal court review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Secretary of HHS*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S.

389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The

Commissioner's findings are not subject to reversal merely because substantial evidence

exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545

(6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

       Under the administrative regulation, the Commissioner will only be bound by

a treating source opinion when it is "well supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in

[the] case record."  20 C.F.R. § 404.1527(d); see also S.S.R. 96-2p.  The regulation also

limits the subjects upon which the Commissioner must defer to a treating source opinion on

"the issue[s] of the nature and severity of [the claimant's] impairment[s]."  20 C.F.R. §

1527(d)(2).  Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer to treating

source opinions on certain subjects that are "reserved to the Secretary," which include

treating physician opinions on a claimant's disability under the Listing, on residual functional

capacity, or a general and conclusory statement of disability or inability to work.  See SSR

96-5p.

       2.    Factual Analysis

In his decision dated March 23, 2003, ALJ Musseman found that Plaintiff's

degenerative joint disease of the lumbar spine was a severe impairment, but did not meet or

medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (R.

23).  The ALJ found Plaintiff's allegations regarding his limitations not totally credible.  It

was determined that Plaintiff could sit, stand, and walk 6 hours in an 8 hour day, and his

Residual Functional Capacity ("RFC") was determined to be work except for lifting and

carrying more than 20 pounds occasionally and 10 pounds frequently, which is the full range

of light work.  Based on an exertional capacity for light work, and the Plaintiff's age,

education, and work experience, ALJ Musseman found him not disabled under Medical-

Vocational Rules 202.15 and 202.22 (R.  24).

Plaintiff challenges to the ALJ's findings on several different grounds: 1) the ALJ

erred by failing to follow the opinion of Plaintiff's treating physician; 2) the ALJ erred by

finding that many of Plaintiff's impairments were not severe; 3) the ALJ erred in failing to

pose an accurate hypothetical question to the VE; and 4) the ALJ committed misconduct.

### a.  Treating Physician Doctrine

Plaintiff argues that the ALJ committed error in failing to give deference to the

opinion of Dr. Kieler, Plaintiff's treating physician.  In his decision of March 24, 2003, ALJ

Musseman states:

> The undersigned has considered the opinions of the treating physician
> regarding the claimant's work ability.  However, these opinions are offered
> two years after the claimant's date last insured, without giving reasons that the
> limitations might apply to the relevant period.  Moreover, there is no evidence
> that the treating physician actually treated the claimant at any time during the
> relevant period for any of his claimed impairments.  The claimant made no
> complaints to his treating physician about his lumbar spine during the relevant
> period.  In fact, there are no recorded complaints until September 1999 . . ..
> While the doctor reported that the claimant was limited by back pain, he
> indicated under oath that the claimant did not complain of back pain until over
> one year later.

(R.  21).

The case law in this Circuit has stated that if adequately supported by objective

findings, and if uncontradicted by other substantial medical evidence of record, a treating

physician's opinion of disability was binding on the Social Security Administration as a

matter of law.[1]  The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Secretary of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).  Yet, this law has been slightly modified by administrative regulation to give the Commissioner broader discretion to reject certain treating physician options.

In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits.  20 C.F.R. §404.1527 [SSI § 416.927].   While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are more strict than those earlier established by the Sixth Circuit.   The 1991 regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.

Under the new regulation, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record."  20 C.F.R. § 404.1527(d) [SSI § 916.927(d)].  *See also* S.S.R. 96-2p.  In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the

---

[1] *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

other medical evidence of record.[2]

                *b. Plaintiff's Arguments*

The Plaintiff claims that Dr. Kieler's sworn statement from September, 2002, proves

that he was treating Plaintiff during the relevant time period, even though the record contains

no proof of this.  In his opinion, ALJ Musseman notes that Dr. Kieler's statement was taken

two years after Plaintiff's date last insured and, while the Dr. testifies that the limitations he

set on Plaintiff were in place in 1998, he does not give supporting evidence for this opinion

(R. 21).  Additionally, ALJ Musseman finds that there is no evidence that Dr. Kieler actually

treated Plaintiff from March to June of 1998.  Plaintiff's supplemental brief states:

> There is no question that Dr. Kieler did not see Plaintiff during the short period
> between the end of Plaintiff's employment and the end of his disability
> coverage.  However, when Dr.  Kieler gave his opinion that Plaintiff had been
> disabled and when he finally stopped working in 1998, that was based upon his
> review of the numerous medical records before his treatment began.

(Pl's Supplemental Br.  2).

Plaintiff argues that because there was no significant change in Plaintiff's condition

from the time he stopped working until the time Dr. Kieler saw him, Dr. Kieler's opinion

should be retroactive to the relevant time period in this case.  While Dr. Kieler treated

Plaintiff on and off over a long period of time, he was not treating Plaintiff during the

---

[2] Those five criteria are:
    (1) the length, frequency, nature and extent of the treatment relationship, including
    the kind and extent of examination and testing sought from specialists or independent
    laboratories;
    (2) the supportability of the medical opinion based on medical signs and laboratory
    findings, with better explanations being given more weight, and whether the opinion
    includes all of the pertinent evidence as well as opinions of treating and other
    examining sources;
    (3) the consistency of the opinion with the record as a whole;
    (4) specialty, with greater weight given to relevant specialists;
    (5) and other factors which tend to support or contradict the opinion.

relevant time in this case and, thus, his opinion need not be accorded special weight.  While Dr. Kieler may believe that Plaintiff's condition did not change from the relevant time in 1998 until the time he saw him, this opinion has no medical evidence supporting it.  The ALJ is not bound to accept the opinion of a treating physician if that opinion either lacks sufficient support in terms of medical signs and laboratory findings, or is either internally inconsistent or inconsistent with other credible evidence of record.  20 C.F.R. §404.1527(c)(2).

While the record is such that reasonable minds might not accept the more extreme opinions of Dr. Kieler, that does not mean his entire opinion may be summarily rejected merely because he treated Plaintiff starting in 1998, and Plaintiff did not complain to him directly as to every symptom and physical limitation. Medical evidence of the applicant's condition after the expiration of insured status must be considered because it may be relevant to the earlier medical condition.  *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984).  This is particularly true where, as here, plaintiff alleges disability involves a chronic long-term condition that one would ordinarily anticipate would have a slow progression.  *See, Ellis v. Schweiker,* 739 F.2d 245 (6th Cir. 1984). Once a condition is shown to exist it may be presumed to have continued.  *See Richardson v. Heckler*, 750 F.2d 506, 510 (6th Cir.  1984).

In this case, the critical question is not whether the evidence is such that an ALJ could reject a treating physician's opinion that Plaintiff is totally disabled.  The evidence is sufficiently equivocal on that ultimate issue that reasonable minds could differ and this Court would need to defer to the factual determination of the Commissioner.  Rather, the question that is more problematic is whether there is sufficient evidence to determine that Plaintiff can

20

perform a full range of light exertional work, upon which ALJ Musseman's Step 5 grid finding under Rule 202.15 is based.   In order to uphold a Rule 202.15 grid determination, there must be substantial evidence that plaintiff has a residual functional capacity to perform a full range of light exertional work.

When a claimant has non-exertional impairments, such as a pain that causes restrictions in the ability to sit, stand or walk, or to undertake certain postures such as bending, reaching or squatting, the grid cannot be used to direct a finding. *Wages v. Secretary of HHS*, 755 F.2d 495, 498-99 (6th Cir. 1985).   *Kimbrough v. Secretary of HHS*, 801 F.2d 794, 796 (6th Cir. 1986), held that the grid could be used to direct a finding only when a claimant can perform a full range of work at the appropriate residual functional capacity level.   *Cole v. Secretary of HHS*, 820 F.2d 768, 771-72 (6th Cir. 1987), noted that the grid could not direct a finding when non-exertional limitations significantly limited the range of work that a claimant could perform.   Other courts have clarified that an exertional limitation does significantly limit the range of work when an applicant is not able to "perform substantially all of the activities in a given category of exertional requirements."   *Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983).

Dr. Kieler in his May 15, 2000 assessment, which he said would have been the same in 1998 when he first began treating Plaintiff, limited Plaintiff's sitting, standing and walking.   Plaintiff's back and knee impairments are documented in the record prior to the critical 1998 period.   Neurologist Dr. Newman as far back as January 1993 limited Plaintiff prolonged sitting or standing as well as stooping, kneeling and squatting (R. 134).   Dr. Andre also limited Plaintiff's sitting and standing as dictated by his comfort level (R. 141).    These

21

unrebutted opinions that Plaintiff has had some degree of sitting, standing and other limitations well before 1998 are consistent with Dr. Kieler's limitations. While Plaintiff was doing some carpentry work during these pre 1998 periods, it would appear his self employment allowed him to limit and pace his undertakings as recommended by his doctors. Thus, there is a substantial question whether Plaintiff could in 1998 do a job unless it provided him some degree of a sit/stand option at will. In such a case *Wages* would preclude a grid finding, and require traditional vocational testimony to a hypothetical question to demonstrate jobs such a worker could perform.

Even more problematic than the sit/stand option issue is Plaintiff's shoulder impairment that precluded his raising his arms above shoulder level. Plaintiff had medically documented right shoulder problems for many years. Dr. Kieler noted Plaintiff's shoulder pain in 2000 when he returned from Florida. It was Dr. Kieler's opinion that in 1998 that Plaintiff could not push or pull or use arm controls or reach above shoulder level. Again, this opinion is consistent with earlier medical opinions. Dr. Newman in January 1993 also limited Plaintiff from reaching and overhead activities and Dr. Andre also limited Plaintiff's to working with objects directly in front of him, i.e., not involving overhead reaching.

While Plaintiff's knee and elbow problems may have improved by 1998 with surgery and injections, Plaintiff's shoulder problems were documented as a serious problem at that time. June 1998 X-rays of his shoulders showed mild changes of degenerative arthritis in the AC joints and a spur at the anterior portion of the acromion process. Dr. Thiel referred Plaintiff to Dr. Habryl for evaluation for shoulder surgery. Plaintiff was found to have am

22

impingement subacromially in his right shoulder, and possible thoracic outlet syndrom (R. 205).

Orthopedic surgeon Dr. Habryl noted X-rays of Plaintiff's right shoulder showed changes with some calcific tendinitis and sclerosis in the subacromial space. Dr. Habryl also advised Plaintiff against doing overhead work. An MRI showed a significant subacromial fluid collection consistent with a bursitis. On July 31, 1998, a tear of the glenoid labrum and impingement syndrome were discovered when right shoulder Arthroscopic surgery was performed. This supports a claim that prior to Plaintiff's last date insured, June 30, 1998, he could not perform work substantially involving his shoulder and no work involving reaching above shoulder level. Even the residual functional report for the state noted Plaintiff's limited reaching ability. (R. 259).

There is not substantial evidence in the record to reject Dr. Kieler's and other physicians' opinions that prior to June 30, 1998, Plaintiff had significant limitations in the use of his right shoulder. Nor is there any evidence from a vocational expert or other legitimate source that with such limitations, a worker could perform a full range of light exertional jobs. Without evidence rebutting the documented shoulder limitations – and possibly also Plaintiff's need for a sit stand option – or without vocational evidence that such a limitation would not limit a worker's performance of a full range of light work, there is not substantial evidence in this record to uphold ALJ Musseman's grid finding of non-disability under Medical Vocational Guideline Rule 202.15. Thus the Commissioner's determination must be reversed under 42 U.S.C. § 405(g) and order a remand.

*Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v.*

*Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). In this case, the record is not complete because of the need for further vocational concerning whether a full range of light work is available for a worker with Plaintiff's shoulder limitations and limitations on sitting and standing, and/or whether substantial jobs exist that Plaintiff could perform in response to a proper hypothetical question.

Given that ALJ Musseman has heard this case twice, and given his apparent frustration with the first remand, a full and fair hearing would best be assured on these questions, as well as an evaluation the present and any new evidence that may be approprite on remand, that a different ALJ hear the matter on remand.

III.    RECOMMENDATION

For the reasons stated above, it is Recommended that Defendant's motion for summary judgment be DENIED and Plaintiff's motion for summary judgment be GRANTED IN PART and the matter remanded to Commissioner for further proceedings consistent with this Report and Recommendation.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections

24

2:04-cv-71697-RHC-SDP   Doc # 16   Filed 04/28/05   Pg 27 of 27   Pg ID 558

constitutes a waiver of any further right of appeal. *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

*Note:* any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: March 31, 2005            _____
Ann Arbor, Michigan                Steven D. Pepe
                                   United States Magistrate Judge